IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:18-CV-00561-KDB-DCK

| | |
|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ORDER ) |
| PORTRAIT HOMES-SOUTH CAROLINA, LLC, ET AL., | ) ) ) |
| Defendants. | ) ) ) |

This insurance coverage matter is before the Court on Plaintiff Pennsylvania National Casualty Insurance Company's ("Penn National") and Defendants Portrait Homes- South Carolina, LLC; Portrait Homes-Oak Bluff, LLC; and Pasquinelli Homebuilding, LLC's (collectively, "Portrait") cross motions for summary judgment. (Doc. Nos. 13, 14). Penn National seeks a declaratory judgment that it is not obligated to provide coverage to Portrait under insurance policies issued by Penn National to one of Portrait's subcontractors, Jose Castillo d/b/a JJA Framing Company and JJA Construction, Inc. ("JJA"), for construction defect claims asserted in connection with the construction of a townhome project in Charleston, South Carolina. In turn, Portrait urges the Court to find that Penn National is obligated to provide coverage to Portrait as an "additional insured" under the same policies.

For the reasons discussed more fully below, the Court will **GRANT** Penn National's motion for summary judgment and **DENY** Portrait's cross motion for summary judgment. While the parties have raised numerous issues, there is one issue that mandates the result being ordered by the Court. Regardless of the scope of the insurance coverage potentially available

1

to Portrait under the Penn National policies, Portrait can only recover under those policies if it still owes or has paid defense or indemnity costs that have not yet been reimbursed, *i.e.*, it has suffered some loss or has some continuing obligation for which it can pursue an insurance claim. However, Portrait's primary insurance carrier fully paid Portrait's defense costs and the agreed settlement payment in the underlying construction defect litigation. Therefore, Portrait does not have any monetary loss that could be paid under the Penn National policies without Portrait receiving a double recovery, which it is not entitled to obtain as a matter of law.

Portrait urges the Court to find that Portrait (or more accurately its assignee the Oak Bluff HOA ("HOA") which is in practical effect the party seeking the recovery from Penn National) will not receive a double recovery. The HOA, who was the plaintiff in the underlying lawsuit, argues that it has not been made whole because its settlements with Portrait and the subcontractors do not cover all the losses and expenses that resulted from the construction defects. In sum, the HOA argues that if Penn National had been at the settlement tables as it should have been, then the settlements would have been higher. However, the HOA acknowledges that it "stands in the shoes" of Portrait and thus cannot obtain any recovery beyond the amount that Portrait would itself be entitled to receive from Penn National. So, while the Court recognizes that the HOA may well have a shortfall with respect to the construction defect damages it suffered, Portrait has already been paid all of its defense and indemnity costs so Portrait cannot maintain a claim against Penn National as an additional insured under the JJA policies. Accordingly, Penn National is entitled to summary judgment in this action.

## I. LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *see also Anderson*, 477 U.S. at 255. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015)

(quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569 (citing *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 352 (4th Cir. 2007)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## II. RELEVANT FACTS AND PROCEDURAL HISTORY

a. The Underlying Litigation

In 2013, Portrait was sued in the Underlying Litigation,[1] in which it was alleged that Portrait was the developer and general contractor of the townhome community known as Oak

---

[1] The "Underlying Litigation" refers to civil actions captioned "*Oak Bluff Homeowners Association, Inc. v. Portrait Homes- South Carolina, LLC,* et al.," C.A. No. 2013-CP-10-7067 (the "Underlying Oak Bluff HOA Construction Defect Action"), and "*John F. Kelly, on behalf of himself and others similarly situated v. Portrait Homes-South Carolina, LLC,* et al*.,"* C.A. No. 2013-CP-10-7066 (the "Underlying Oak Bluff Construction Defect Class Action"), filed in the Court of Common Pleas for Charleston County, South Carolina.

4

Bluff in Charleston, South Carolina. Portrait allegedly performed development, construction, repairs, and modifications on the Oak Bluff project between 2002 and 2005.

Several of Portrait's subcontractors and material suppliers on the Oak Bluff project were also named as defendants in the Underlying Litigation, including JJA Construction, Inc. d/b/a JJA Framing and Jose Castillo d/b/a JJA Framing. The subcontractors performed all types of work on the Oak Bluff project, including framing, roofing, vinyl siding, masonry, windows and doors, plumbing, painting, etc. With respect to JJA, it was alleged that they were negligent, breached warranties, and engaged in unfair and deceptive practices.

  b. <u>The Insurance Contracts</u>

During the relevant time period, Portrait was insured under a series of CGL policies, issued by Admiral Insurance Company ("Admiral") to Portrait (the "Admiral Policies"). The Admiral Policies were effective from September 1, 2003 to February 23, 2011.

Portrait's subcontractor JJA was insured by Penn National, which issued the following CGL policies (the "Penn National Policies" or the "JJA Policies") to JJA:

  **1.** Policy No. GL9 0601617 issued to "Jose Castillo d/b/a JJA Framing Company", effective from December 5, 2002 to March 2, 2005.

  **2.** Policy No. GL9 0601617 issued to "JJA Construction, Inc.", effective from March 2, 2005 to December 5, 2008.

  **3.** Policy No. GL9 0649575 issued to "JJA Construction, Inc.", effective from July 9, 2008 to November 3, 2008, and July 9, 2009 to July 9, 2010.

  c. <u>The Defense of the Underlying Litigation</u>

After it was served with the complaints in the Underlying Litigation, Portrait tendered the litigation to Admiral and Admiral provided Portrait with a defense in the Underlying Litigation. Admiral paid $100,000 for Portrait's defense in the Underlying Lawsuits. During the underlying litigation, counsel for Portrait sent a letter to Penn National dated December 4,

2014, requesting that Penn National afford "additional insured" coverage to Portrait under the Penn National policies. In the December 4, 2014 letter, counsel for Portrait states that "Portrait's contract with your Primary Insured expressly required it to obtain insurance policies that name Portrait by separate endorsement as an additional insured" and that "[t]his contractual obligation on the part of your Primary Insured was apparently complied with, at least in part, as Portrait was named as a specific additional insured under the policy/policies issued by your company." Portrait alleges that it never received a response from Penn National. In turn, Penn National does not allege that it provided a response; rather, it alleges that Portrait was not entitled to coverage under the Penn National policies. There is, however, no dispute that Penn National never provided a defense to JJA (nor was one needed because a defense was already being provided and paid for by another insurer).

    d.  <u>The Settlement of the Underlying Litigation</u>

Portrait ultimately settled the claims against it in the Underlying Construction Defect Litigation. Pursuant to the terms of the Settlement Agreements and Releases, Admiral paid $2,214,250 to the plaintiffs in the underlying litigation to settle the claims asserted against Portrait. Pursuant to that settlement, Portrait executed an assignment of all claims (including Portrait's putative claims against Penn National for coverage as an additional insured) to the Oak Bluff Homeowners Association, Inc. Also, a number of the defendant-subcontractors (or their insurers) settled the claims asserted against them in the Underlying Litigation, in the total amount of $4,133,500. In exchange for these payments, the Oak Bluff HOA and Portrait released all claims against these defendant-subcontractors.

Separately, the Oak Bluff HOA entered into a Full and Final Release in favor of JJA and one of its other insurers, Nationwide Mutual Fire Insurance Company, on January 28, 2019.

This settlement dismissed the claims against JJA in the Underlying Litigation in exchange for a payment of $100,000. Pursuant to the terms of the settlement, the Oak Bluff HOA not only released Jose Castillo and JJA Construction, Inc. from all claims arising out of any framing work on the Oak Bluff project and the work performed by Jose Castillo and JJA Construction, Inc., but also agreed that "this Release constitutes a general release of all claims of the releasing parties and no claims or potential claims are being reserved as against any other person, firm or corporation."

### III. DISCUSSION

Both parties have moved for Summary Judgment. Penn National seeks Summary Judgment on three grounds. First, it contends that Portrait did not qualify as an insured or "additional insured" under the terms of the policies issued by Penn National. Second, even if Portrait was entitled to "additional insured" coverage under the Penn National policies, Portrait is not entitled to reimbursement for defense costs and settlement payments made by its insurer Admiral, which are the limit of its potential claim. Third, Penn National contends that Portrait is not entitled to reimbursement of defense and settlement costs because Portrait assigned its "additional insured" claims to the Oak Bluff Homeowners Association, Inc. ("Oak Bluff HOA"), and the Oak Bluff HOA has entered into a general release which releases those claims (and all others "as against any other person, firm or corporation"). In turn, Portrait claims that Penn National breached its duty to defend and indemnify Portrait under the "additional insured" endorsement to the JJA policies and having breached the duty to defend cannot contest coverage in this action.

As discussed above, the Court has determined that Penn National is entitled to summary judgment on its second argument, i.e., that allowing Portrait to recover the defense and

7

indemnity costs already paid by Admiral would constitute a prohibited double recovery. Therefore, the Court need not address and rule on the underlying insurance coverage dispute or Penn National's argument that the general release in HOA's settlement with JJA released Portrait's claims against Penn National.

Penn National contends that Portrait is only entitled to reimbursement for defense costs and settlement payments actually made (or still owed) by Portrait in the defense or settlement of the claims asserted against it in the Underlying Litigation. *See Lowe v. Fid. & Cas. Co. of N.Y.*, 170 N.C. 445, 87 S.E. 250 (1915) (awarding the costs and expenses incurred by insured in defending the underlying action as damages for the insurer's breach of contract to defend); *Duke Univ. v. St. Paul Mercury Ins. Co.*, 95 N.C. App. 663 (1989). If so, then Portrait is not entitled to reimbursement for the amount paid by its insurer Admiral, which fully defended and settled the claims against Portrait in the Underlying Litigation and is not a party to this action. *See Duke Univ.*, at 681–82, 384 S.E.2d at 47 ("[W]here a property owner is entitled to protection against loss . . . under two contracts, one of which is a fire insurance policy, and . . . the owner recovers a portion of his loss from one, he can only recover the remainder of his loss from the other, and if he has been fully compensated by one he is not entitled to recover from the other.") (quoting 25 C.J.S. Damages Sec. 99(2), at 1016 (1966) (footnotes omitted)).

In *Duke*, the University filed suit against its general liability insurer, St. Paul Mercury Insurance Company ("St. Paul"), as well as its "errors and omissions" insurer, Continental Casualty Company ("CCC"), seeking to recover attorney's fees that Duke incurred as a defendant in a lawsuit involving a psychiatric hospital that it owned. *Id.* at 665. CCC approved Duke's legal counsel and paid their expenses. *Id.* Duke subsequently notified St. Paul of the underlying action and requested St. Paul's assistance in defending the action. *Id.* at 666, 384

S.E.2d at 37. While the court held that Duke was entitled to coverage from St. Paul for certain defense costs, St. Paul was entitled to a credit or set-off to the extent that the award against St. Paul duplicated legal fees that had been paid by CCC. *Id.* at 682. In other words, Duke was only entitled to recover its legal fees once, and after the fees had been paid could not require another insurer to also pay the fees. Applying the reasoning of *Duke* to this action, even if Penn National had breached its obligation to defend and indemnify Portrait as alleged by Portrait, Penn National would still be entitled to set-off the amounts already paid by Admiral, thus effectively negating any liability under Portrait's claim for coverage based on Penn National's failure to defend Portrait in the Underlying Litigation.

North Carolina cases after *Duke* reach the same result. See *Cone Mills Corp. v. Allstate Ins. Co.*, 114 N.C.App. 684 (1994) (approving the "general rule" applicable to setoffs in contract actions as stated in *Duke:* "[D]efendant in an action for breach of contract is entitled to show any matters which go to reduce the amount of loss actually suffered by plaintiff, provided such matters have a proximate relation to the contract.... Payment of compensation ... to plaintiff by a third party on the same cause of action, or partial satisfaction from a third person against whom a claim for damages is made with respect to the same subject matter may be shown in reduction of damages for breach of contract"); *Knight Publishing Comp., Inc. v. Chase Manhattan Bank, N.A.*, et al., 131 N.C.App. 257 (1998) ("[I]t is uncontroverted that while Knight Publishing is entitled to fully recover its damages, Knight Publishing is not entitled to a 'double recovery' for the same loss or injury. (citations omitted). … 'the weight of both authority and reason is to the effect that any amount paid by anybody ... for and on account of any injury or damage should be held for a credit on the total recovery in any action for the same injury or damage.' Id. … [This] has been quoted as controlling law in numerous types of damage cases. See e.g., 25 C.J.S.

9

Damages Sec. 99(2) at 1016 (footnotes omitted); *Duke Univ. v. St. Paul Mercury Ins. Co.*, 95 N.C.App. 663, 681–82, 384 S.E.2d 36, 47 (1989) … )."

Penn National also relies on *Crossmann Communities of North Carolina, Inc. v. Harleysville Mut. Ins. Co.*, No. 4:09-CV- 1379-RBH, 2013 WL 5437712 (D.S.C. Sept. 27, 2013), in which Beazer, a general contractor, sought reimbursement from its subcontractors' insurers for defense and indemnity payments made by the general contractor to resolve claims asserted against it in an underlying construction defect lawsuit. In *Crossmann*, the court rejected Beazer's argument that the amount that Beazer had already received from other insurers constituted a "collateral source" for which Harleysville could not receive an offset. In so holding, the court found that "[t]o allow Beazer to recover a second time from Harleysville for defense costs for which it has already been reimbursed would allow Beazer to obtain a legally impermissible windfall and double recovery." *Crossmann*, at *25.

The *Crossmann* court noted that allowing an offset for the amounts paid by other insurers to reimburse Beazer for its defense costs did not violate the "collateral source" rule because "[u]nder the collateral source rule, a tortfeasor has no right to any mitigation because of payments or compensation received by the injured person from a source wholly independent of the wrongdoer" and "[t]he purpose of the collateral source rule is to prevent a tortfeasor from obtaining a windfall." *Id.* at *26. The court further stated that "the clear majority of courts have rejected the application of the collateral source rule where more than one insurance policy or third-party provides coverage for the same loss." *Id.* (citing numerous cases)

The *Crossmann* court explained:

> This national consensus exists for good reason: the policies underlying the collateral source rule "are less compelling" in a breach of contract case than in tort actions. (Restatement (Second) of Contracts § 347 cmt. e (1979))…. Unlike in tort law, the

10

> purpose of damages in contract law is not deterrence or punishment. "The purpose of an award of damages for breach of contract is to put the plaintiff in as good a position as he would have been if the contract had been performed." (citation omitted).… Applying the collateral source rule to contract law would "contravene this principle by awarding the non-breaching party more damages than necessary to compensate it for the breach."

Portrait cites cases from other jurisdictions in support of its position that it should be entitled to reimbursement for defense costs and settlement payments even though another insurer has already paid those costs. Typical of those cases is *Otis Elevator, Inc. v. Hardin Construction Co.*, 316 S.C. 292 (1994). In *Otis*, the elevator company had been sued by a third-party who was injured while using an elevator that Otis Elevator installed and had permitted a construction company to use on a temporary basis under a "Temporary Acceptance Agreement" while Otis Elevator completed installation of the elevators. *Id.* at 294, 450 S.E.2d 41, 43. The agreement included an indemnity provision which required the contractor to "provide a competent operator" for the elevator and to indemnify Otis Elevator for claims arising out of the use of the elevator. *Id.* Otis Elevator settled the suit against it, and then filed suit against the construction company, seeking contractual indemnity pursuant to the terms of the parties' agreement. *Id.* at 295–96, 450 S.E.2d 41, 43–44.

The court found that Otis Elevator was entitled to contractual indemnification from the construction company pursuant to the terms of the "Temporary Acceptance Agreement" because the evidence in the action indicated Hardin Construction, not Otis Elevator, had the duty to provide a competent operator for the elevator and acted negligently in failing to provide a competent operator for the elevator at the time of the accident. *Id.* In fact, the court noted that the jury in the *Otis Elevator* case found by special interrogatory that no acts or omissions of Otis Elevator caused the accident. *Id.* Under

11

those facts, the court held that Otis Elevator was entitled to contractual indemnity from the construction company, and that the judgment against the contractor should not be offset by the amount that Otis Elevator's insurer paid in the third-party tort suit against Otis Elevator. *Id.* at 300, 450 S.E.2d, 41, 45. In so holding, the court cited cases applying the "collateral source" rule to contractual indemnity claims against a negligent party found to have been responsible for the underlying harm for which indemnity was sought. *Id.* at 45–46, 428 S.E.2d at 300 (citing *Johnston v. Aiken Auto Parts*, 311 S.C. 285, 428 S.E.2d 737 (Ct.App.1993) ("[A] wrongdoer is not entitled to have the damages for which the wrongdoer is liable reduced by proving that the plaintiff will receive compensation or indemnity for the loss from a collateral source, wholly independent of the wrongdoer."); *Tillman v. Wheaton–Haven Recreation Ass'n*, 580 F.2d 1222, 1230 (4th Cir. 1978) (finding that the collateral source rule is consistent with the court's holding); *Alyeska Pipeline Serv. Co. v. H.C. Price Co.*, 694 P.2d 782 (Alaska 1985) (holding that "[t]he collateral source rule provides that any benefits received by an injured party from a source which is entirely independent of and collateral to a wrongdoer who is legally responsible for the injuries will not serve to reduce the damages otherwise recoverable from the wrongdoer.")).

The *Otis Elevator* case is distinguishable from this case because it did not involve a claim by an insured against an insurer, but rather involved the application of the "collateral source" rule under South Carolina law in the context of an indemnity claim brought by one party (Otis Elevator) against another party (Hardin Construction) that had been found to have been negligent in causing the injury for which claims had been asserted against the first party (Otis Elevator). Under South Carolina law, the "collateral source" rule provides that "compensation received by an injured party from a source wholly independent of the

wrongdoer will not reduce the amount of damages owed by the wrongdoer." *In re W.B. Easton Const. Co., Inc.*, 320 S.C. 90, 92, 463 S.E.2d 317, 318 (1995). As such, under the circumstances in the *Otis Elevator* case (i.e. a tortfeasor seeking to reduce its liability based upon insurance proceeds paid on behalf of a joint tortfeasor), the court simply applied the "collateral source" rule. *Otis Elevator*, at 300, 450 S.E.2d 41, 45.

Therefore, although the "collateral source" rule may have applied under the facts at issue in *Otis,* the rule does not apply in this case. Penn National is not a tortfeasor or alleged "wrongdoer" who caused the damages at issue in the Underlying Litigation. Rather, at most, Portrait alleges that Penn National is a co-insurer (along with Admiral). Consequently, the "collateral source" rule has no application to the present matter. *See Crossmann*, *supra*.[2]

At oral argument Portrait argued that the amount of the settlement agreed between the HOA and Portrait should not be the limit of Portrait's recovery under the Penn National policies because the settlement separately included an assignment of Portrait's claims as an additional insured and it would be inequitable to limit Portrait's claim under those circumstances. However, Portrait cannot assign to the HOA more rights than it has against Penn National, and the Court cannot allow a jury to speculate on the amount of the settlement

---

[2] Similarly, other cases cited by Portrait in support of its claim for reimbursement of defense costs and settlement payments - *List & Clark Constr. Co. v. McGlone*, 296 S.W.2d 910 (Mo. App. 1956) and *Alyeska Pipeline Serv. Co. v. H.C. Price Co.*, 694 P.2d 782 (Alaska 1985) - also involved contractual indemnity claims brought by contractors against their subcontractors, who had been found to have been negligent in causing the injury for which the contractors had been held liable. Furthermore, in those cases, the court found that the insurers that had paid the defense costs were subrogated to all rights of the insureds seeking reimbursement and were reimbursed in full by the insured. *List & Clark*, at 912; *Alyeska Pipeline*, at 788. Accordingly, this case is distinguishable from those cases not only because this case does not involve a claim for indemnity against a joint tortfeasor or "wrongdoer" who caused the damages at issue, but also because the claim for reimbursement is not being sought by Admiral as the subrogee of Portrait, but rather by Portrait itself (or by its assignee).

that might have been agreed to if Penn National had participated in the settlement. Portrait and the HOA voluntarily agreed to the terms of the settlement, which fully resolved the claims against Portrait without any continuing judgment or liability. Thus, the terms of that settlement limit as a matter of law the amount which Portrait can claim as an "additional insured" under the JJA policies.

In summary, Admiral paid the entire amount of the defense costs and settlement on behalf of Portrait in the Underlying Litigation. And, those are the only costs that Portrait may properly claim as an "additional insured" under JJA's Penn National policies. On these undisputed facts, the Court finds that Portrait is not entitled to any further reimbursement from Penn National for any defense costs or settlement payments, which would amount to a prohibited "double recovery" under North Carolina law.

**NOW THEREFORE IT IS ORDERED THAT**:

Plaintiff's Motion for Summary Judgment (Doc. No. 14) is **GRANTED**, Defendants' Motion for Summary Judgment (Doc. No. 13) is **DENIED**, and **SUMMARY JUDGMENT** is hereby entered in favor of Pennsylvania National Casualty Insurance Company on all the claims in this action. The Clerk of Court is directed to close this case.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: September 17, 2019

Kenneth D. Bell
United States District Judge